The Honorable, the judges of the United States Court of Appeals for the 4th Circuit. Oyez, oyez, oyez, all persons having any manner or form of business before the Honorable, the United States Court of Appeals for the 4th Circuit are admonished to draw nigh and give their attention, for the Court is now sitting. God save the United States and this Honorable Court. All right, be seated, please. All right, the first case we'll hear today is Racing LLC, 2311 Racing LLC from NASCAR, and Mr. Yates will hear for you. Good morning, and may it please the Court. I will focus my argument time on three issues. First, no court has ever held that a release of claims provision can be anticompetitive conduct in violation of Section 2 of the Sherman Act. That means, as I'll explain, that the injunction must be reversed or at the very least vacated. Second, the district court erred as a matter of law in its one-sentence conclusion regarding antitrust injury because a release does not harm competition. A release, of course, just focuses on the legal claims between the two parties. It has no impact on competition. Third, the district court's injunction here is a mandatory injunction and guarantees payments to teams that did not sign the 2025 charters and thereby harms NASCAR and also other racing teams. The harm to NASCAR is the injunction imposes an unwanted contractual relationship with these plaintiffs instead of allowing NASCAR to have the option of providing charters, and NASCAR provides charters for free, to teams that currently race in IndyCar or other motor sports and who want to work and come in to NASCAR, race stock cars, and work collaboratively with NASCAR to grow the sport. That is what the charter system is all about at the end of the day, is working collaboratively. If we were to agree with you, what would happen from this point going forward? Because I see you've already run some big-name races, Darlington, Talladega, Martinsville. If we agree with you, what happens for the rest of this season? If you reverse, as I urge you to do, what happens is the plaintiffs run as open teams. There are at least four slots in every NASCAR race for open teams. The undisputed evidence below is… So would they have to qualify race by race for that? They will, but the undisputed evidence below is they would have qualified for every race. But the whole point of the charter system, Your Honor, is to work collaboratively together to grow the sport. These plaintiffs, they were offered a contract. They rejected the contract. If Your Honors were to look at, for example, JA 67 to 69, that's 2311 in September of last year, raising eight points that it did not agree with a contract. And then front row, the other plaintiff here, JA 83, says that front row cannot agree to the current agreement as written. We all learned in first year contract law that the September 2024 rejections of NASCAR's offer meant there's no contractual relationship between the parties. Yet the district court's injunction orders a contract, therefore upends the status quo. And what's the harm to other teams that I mentioned earlier, Your Honor? This is kind of a clarification question. Whether we agreed with you or agreed with the other side, has trial been set? Trial has been set. And when is that? December. So in theory, well, how long is it set for? The trial is currently set, I believe, for two weeks, Your Honor, but there are now counterclaims, and so we need to discuss that with the district court. Because the counterclaims below talk about the joint negotiations by these plaintiffs. So what's the likelihood that that's going to be done before the 2026 season? The trial, I think, will be done before the 2026 season. Okay. All right. I think that's certainly true, unless, of course, the case gets expanded or the district court decides to move the trial date, which obviously it's within its discretion to do to manage its docket. But the point is that two-thirds of this season remains, and other racing teams would receive more money if NASCAR was not making guaranteed payments under a court-mandated contract to these plaintiffs. And so that is a real harm not just to NASCAR but to other racing teams. Other racing teams would receive more money if NASCAR had not been ordered into this contractual relationship with these plaintiffs. So this injunction very clearly upends the status quo. It very clearly is a mandatory injunction. But going back to the release, the release here, it has to be, it cannot be anti-competitive conduct. The district court announced what amounts to a new categorical rule that an alleged monopsonist cannot include a release of claims provision in a commercial contract, and that doing so constitutes both exclusionary conduct and antitrust injury. Everything flows from the contention that a release of claims can be anti-competitive conduct under Section 2 of the Sherman Act. The district court broke with over 125 years of Sherman Act jurisprudence in reaching that conclusion. No case, no case in history holds that a release of claims provision violates or is, violates Section 2 or can be exclusionary conduct under Section 2. That's for good reason. Releases of claims are common. They're common in commercial contracts because after negotiations are completed, the parties want to move forward with a productive relationship and extinguish potential claims between them. That was certainly true here. The teams wanted the benefit of the release in 10.4 that NASCAR gave to the teams. They wanted that release, and NASCAR wanted to move forward with teams that had signed the new 2025 charter and who, therefore, had signaled a willingness to work with NASCAR to grow the sport. Those two and a half years of negotiations, and there were two and a half years of negotiations over this, which is a red flag that NASCAR is not a monopsonist because monopsonists do not negotiate for two and a half years, but it resulted in a material increase, and this is undisputed, in the amount of compensation flowing to teams. That's another signal that NASCAR is not a monopsonist. The whole theory of monopsony law is that the buyer depresses the amount it is buying and, therefore, depresses prices, but we've got the exact opposite occurring here. But these plaintiffs, these plaintiffs rejected the offer because they wanted even more. As I said, 2311 identified eight points of contention and rejected NASCAR's offer. I think perhaps the district court misunderstood this context. It inherited the case about a week before it issued its injunction, but regardless, the likelihood of success finding here is based entirely, entirely on the district court's conclusion that a release of claims can constitute anti-competitive conduct under Section 2. Now, plaintiff's brief is notable in that it doesn't really even try to defend the district court's decision with respect to the release. Again, it's likely because release of claims provisions are routinely enforced. This court in the Virginia Impression Products did so. The Second Circuit did so in the VKK NFL case. Now, the district court here relied on cases that talk about prospective future releases and consider whether or not to invalidate them as a matter of contract law or public policy. Those cases are entirely different. Those cases are about whether the contract can be enforced, the terms of the contract can be enforced. I'm not sure the release purports to release future claims. I thought the release in this case is a standard release in existing claims. That's exactly what it is, Judge Niemeyer. It's a standard release, and they were not bound by it if they didn't sign the contract. They were also not bound by the exclusivity provision if they didn't sign the contract. But the key point is this is just a standard retrospective release of claims that happens all the time when people enter into commercial relationships. This court should not be the first appellate court or even the first court other than the district court below to contend or conclude that a release of claims provision can violate Section 2. Now, the lone case that the plaintiffs cite in their brief to try to defend the district court's decision on the release is the Total Vision case from the Central District of California. Now, that case does not actually support them. That case involves a contention that an alleged monopolist had a release that was part and parcel of an antitrust violation, and the district court there wanted to do. It said we can't decide on a motion to dismiss whether or not we can enforce that release. That's a matter of contract, and it's a matter of policy. Notably, the district court in that case, I'm sure Your Honors and your clerks will look at it, what does that case go on to do? That case, after saying I can't decide whether or not on a motion to dismiss to enforce or invalidate the release, it goes on and says let's actually analyze all the allegations the plaintiffs have made in that case about alleged exclusionary acts. Why is that important? Well, not even the plaintiff in that case alleged that a release was an exclusionary act. So I'm sure I understand your view of the release here. If, say, after the next race, the plaintiffs were due X, whatever that is, and the NASCAR paid them X minus 10, the release would not affect their rights to recover in that circumstance. Well, I'll say it's a retrospective release. Your Honors, hypothetical is challenging because we have a situation where the plaintiffs have been given the benefits of a contract that they rejected. And so in our view, they shouldn't get any of that. And the district court expressly said that it would consider in the future, if its injunction was reversed, how to address those kind of monetary flows. So I would say that the release itself is retrospective. What flows from the district court's erroneously, in our view, issued injunction I think is a different question, Your Honor. I hope I answered your question there. Well, not exactly. But, I mean, if it's retrospective, I would not think that some future act would be barred by it. I agree with you 100 percent on that, Your Honor. What I'm saying is that the plaintiffs have received money, tens of millions of dollars. You all think they shouldn't get any of that. I understand that. Thank you. The release, they were mutual releases too, right? Exactly, Your Honor. So that each side is releasing the other if you get under the contract. Exactly. This is what happens every day in the United States. I gather your position is if they think the release is anti-competitive in some fashion, they either decide to enter the contract and give up that right, which is a right to sue, or they can refuse to enter the contract and sue you in the antitrust laws. But your argument is they can't have their cake and eat it too. The Omega problem? That's definitely right. There is definitely an Omega problem here. This Court's decision in Omega clearly applies, because you can't ask to be bound to something you're simultaneously contending violates the antitrust laws. In fact, I think their damages case in December will rely on alleged lower payments, including in this Cup Series season. But they wouldn't have been entitled to those payments but for the district court's order. But I think the key point here is the release is retrospective. No court in history has ever said that a release can constitute anti-competitive conduct. The antitrust laws are all about protecting competition at the end of the day. This Court's decision, obviously, in It's My Party, talks about whether there's been an exercise of market power to foreclose competition. I think, Judge Niemeyer, you were on that decision. But a release can't have an effect on competition. It only impacts things between the parties. It has no impact on price or output. Here, if the plaintiffs don't like the deal, they don't need to enter into that contractual relationship with NASCAR. But if you want to enter into a contractual relationship with NASCAR, there are various terms that you have to agree to. But what's really important here is that in over two and a half years of negotiations, these plaintiffs never once raised the release. They never said there's a problem with a release in Section 10.3. Well, that's a little beside the point, because the district court relied exclusively on the release to justify its primary injunction and ordered them, ordered, allowed them to participate in the contract but modified it by saying the release doesn't apply. But they rejected the contracts, Your Honor, in September of 2024. Well, then if they rejected the contracts, they shouldn't enter into them. But my point is that what's before us is an interlocutory appeal on a very narrow issue, a preliminary injunction, and I don't think we should be deciding what grounds would justify a preliminary injunction. I think we have to take the district court where the court is and decide whether it would justify it. I agree with you. And the sole basis for the preliminary injunction is including a release of claims provision, which, as Your Honor correctly noted, is part of a reciprocal release of claims in a commercial contract. No court has ever said that is exclusionary conduct, but that's what the district court did here. It said it's both exclusionary conduct and also constitutes antitrust injury. And the district court just misapprehended both exclusionary conduct and antitrust injury. And I see my time is up. Okay. Thank you, Mr. Yates. Mr. Kessler. Good morning, Your Honors. I will focus on this exclusionary conduct issue with regard to the release. My friend made some statements that are not consistent with the record here, and it's very important because there is no disagreement here about the legal standard that the judge below applied with respect to determining what is exclusionary conduct. He applied this court's rulings in Duke Energy, which is the most recent statement of that. It's interpreting the Supreme Court authority. So there's no legal dispute. This is a factual dispute. Wait just a minute. I'm not sure about that. I had thought coming in, and you can correct me. I had thought coming in that the district court concluded that the release was anti-competitive, and therefore in order to preserve your antitrust claims. So the court wanted you to be able to race, but without a contract that included the release. And my concern, and I'll just lay it out there, is I don't understand the Section 2 analysis. I mean, what we need to have is the exercise of monopoly power to exclude competition. I can't see why a release addresses competition in any sense if you enter in the contract. If you don't want the contract, you don't enter into it, and you sue. Or if you want the contract, you enter into it, and you've given up past releases. But I think what I'll make an observation is you can't have your cake and eat it too. Your Honor, you asked three different things. Let me try to answer all three. Let me try to answer all three. First, on whether they could have just not taken the contract. We have an uncontested finding. So it's not before your Honor that the district court found we would suffer severe irreparable harm. Stay away from the harm. Stay away from all that. Go to the antitrust theory. Okay, I'll go right to it. That's my biggest problem is the likelihood of success. I have not been able to construct a Section 2 claim based on the inclusion of a mutual releases. These are mutual releases. The first paragraph is your release, and the next paragraph is their release. And so the question is, is the inclusion of mutual releases in a contract anti-competitive in the sense that a monopolist can't include it in their contracts? So the issue, your Honor, if I may, is has the release been used to help maintain the monopoly position? Okay, let's say it is. Let's say it is. Then you don't enter into it. But you don't sit there and say, I want in under that contract and say, but I want it modified to allow me to bring my antitrust claim. If you think the release excludes you from the race, from the opportunity, it's a very, very difficult antitrust theory that you have. And I've been trying to figure it out. I think this whole area, you know, the NFL and baseball leagues, you try to figure out what is the relevant market and what is the anti-competitive conduct, because competition inherently is regulated in a context where you have a league with competing teams with a sport. Now, they clearly regulate all the rules, the size of the engines or the size of the baseball bat or whatever. But the question here is you want in the league, but you don't want to sign the mutual releases. And the question is the mutual releases would get rid of preexisting antitrust claims. So if you have preexisting antitrust claims, you should bring them and don't expect to get the contract. Or if you want the contract, then you ought to expect to get rid of the preexisting antitrust claims. But I don't see how you can say, I want in and have the contract modified to eliminate the mutual releases. So the difference, Your Honor, I believe in this case on these facts is as follows. Because they have a monopsony, which controls the ability of our teams to compete. There's no other place to compete. Which is similar to the NCAA Alston case where the college athletes had no other place to compete in college sports. That was it. When you control the whole access on a monopsony, to maintain your monopoly, assuming it was used to help maintain the monopoly, by saying the only way you can compete is to give up your ability to file antitrust claims to challenge the monopoly. You don't give up antitrust. You can bring those antitrust claims. But that doesn't mean you get in. In other words, the relief you're getting is to get in and you have to be successful on your underlying antitrust claim. But in this case, they're letting you in under the preliminary injunction and modifying the mutual releases. And I haven't seen why that is anti-competitive. What it is, it's anti-lawsuit. But you can preserve your lawsuit by not entering the contract. So, Your Honor, if we assume and we put in expert testimony, which was uncontested by them on this issue, that the release was anti-competitive to maintain the monopoly and protect the exclusionary conduct. That's a formula. How is it? You release something. It's not anti-competitive. It is, Your Honor, if it serves to keep out the most likely plaintiffs who would challenge your monopoly. What you need, Your Honor, this is important. They need some offsetting pro-competitive effects. If you sign the release, you'd be in there racing. Now, what's the problem? You have the relief you wanted, which is to race. And they would not exclude you. The only reason the court is excluding you is because you refused to sign the release. But the position they've taken, and this is important, even though my friend says now it's retrospective, their position in this case is because all the exclusionary conduct has already started and is continuing. They have taken the position the release precludes both the claims up until now and the claims going forward for the continuing exclusionary conduct in a monopolist. Well, do you have any legal authority to support your position? Because opposing counsel says that in the 125 years of the Sherman Act, nothing supports what was done here. So the precise question as to whether or not a monopolist may use a release to help maintain its conduct has not been approached either way. So it's not like there's a case one way or the other. So what do we look to? So no. So this would be the first time. So he's right about that. It's the first time the issue has come up in the context of a monopolization claim of maintenance. However, the guidance is you've had who knows how many contracts over time. And I did a lot of contracts, and they had an awful lot of releases in them. It's just hard to see that in all the history of contract law, particularly when you bring in antitrust, that this is just an issue that's never come up. And maybe the reason for that is because a release in and of itself is not. I mean, you may be able to show a trial that it's part of an anticompetitive process. But, I mean, it just seems like a big hill to climb if you don't have a case that supports you. So, Your Honor, the reason I think it's never come up is, one, as Your Honor may know, there are very few adjudicated monopolization cases at all. There are a handful in the Supreme Court. There are a handful in the Court of Appeals. And it has never come up that this particular conduct is there. But what do we know? We know in Mitsubishi Motors that the Supreme Court ruled that using a release to protect antitrust behavior would be against public policy. We know that. Let me ride with you. I understand your position. Your position is you have legitimate antitrust claims because apparently your argument is you are excluded from this racing. I don't know what other grounds you're relying on. But if you sign the contract with the mutual releases and give up those antitrust claims, you end up achieving exactly what you wanted, which is to be racing, being participating in the racing. Now, what you want is you want to have the success of your antitrust claim preserved, which the object of the antitrust claim would be to get in to be a member of the racing series, whereas if you sign the contract, you would be. Now, the release of prior conduct is just a peacemaking device. Mutual releases, they sue each other because they're in a contractual relationship. But if you didn't like it, not for noncompetitive reasons, you wanted to preserve your antitrust claim, which doesn't make sense if you were going to get in by signing. But if you want to preserve your antitrust claim, you don't sign the contract. But then you don't sign the contract, you rely on your antitrust claim to get in the league, not by contract. But the idea of including a release in a contract and call it anti-competitive, I don't see it even addresses competition. What it addresses is your antitrust claim. So, yes, Your Honor, but a monopolist preventing the most likely plaintiffs who will suffer the injury from bringing claims to challenge the monopoly. They won't suffer the injury if they sign the contract and enter the competition. If they sign the contract, they can't bring the claims and the monopoly is protected. That's the problem. Why do they want to bring the claims? Because their original antitrust claim was to get into race. No, Your Honor. So let me correct that, please, if I can. The claim was that NASCAR engaged in a series of exclusionary conduct, restrictions on racetracks so no competitor could be formed, restrictions on us that we couldn't go to competitive races. What did you want under your antitrust claim? Set aside the releases in the contract. Yes. What relief did you want? We want to get an injunction against all of these exclusions. No, no. What relief do you want for your racing team? You want to be racing in that series, right? We could have done that, Your Honor, under their terms already. That was not the object of this release. Do you want to be a policeman? Is that what you want to do? No, no, no, Your Honor. So this is a monopsony case. And think of it like a consumer monopoly. I understand what it is. Your Honor, let's say we had an apple monopoly. And they charge, they use exclusionary conduct to get a monopoly of apples. Then they charge higher prices for apples. So consumers sue because they're paying too high a price and to get an injunction to stop them from excluding other apple farms from coming in and providing competition. In a monopsony case, we are selling our services, the reverse of the monopoly, to NASCAR, who has the monopsony. They set below competitive market prices to buy our services, just like in the NCAA, set no compensation for the college athletes. So the injury is you're getting too little. The relief that we want is to get damages for paying. And they sign the contract, don't sign the contract, and sue and get your relief. But to claim that you're entitled to the contract without the release is really an Omega problem. But, Your Honor, I'll come to Omega in a second. But the problem with that is that you let the irreparable harm that's uncontested, because that's what was found, they didn't contest it, that it was found it is not economically viable to have to qualify each week. As Judge Agee raised, you may not get in, you lose your sponsors, you lose your drivers. It's in the record that our drivers have contracts. If we are not charted teams, they can abandon us and go to different teams. So what they've done ñ I think I can see all this at trial. It would be a very interesting trial yet to happen. But the only thing we're here on today is the preliminary injunction. And the only basis that the district court ruled on for success on the merits was a release. So it seems like to me it's the release and the release only that's determinative for today's purposes. So the reason, Your Honor, I would say is that if the court didn't find the release alone was adequate, I do believe that since you could affirm on any grounds, you could look at all the evidence of the other exclusionary conduct, which is really classic monopolization behavior. That would make us a rule on the preliminary injunction. That is something for the district court to do. But the preliminary injunction here was not based on the likelihood of that success. It was based on the fact that this contract had a release in it. And the court mandated the signing of the contract without the effective enforcement of the release. Your Honors, I believe, have the full authority, if it's your discretion, to sustain the preliminary injunction on any ground. The evidence is all on the record. It could be done. The problem is, is if you reverse on this ground and now we say, okay, we want you to rule on the other exclusionary conduct, we are, as Judge Agee noted, halfway through the season. We may lose our drivers in the interim. We may lose our sponsors. All this irreparable harm may come with the trial on December 1st. It would seem to me that if your Honors believe that the other exclusionary conduct, and under Duke you would look at the whole thing together, would clearly justify this, even though the district court didn't specifically find that, you certainly have the power to say there's a sufficient likelihood of success on that basis. Have you seen any case where a court of appeals is given a preliminary injunction entered on one ground and it goes down and makes findings of fact and conclusions of law with respect to the record that was not relied on by the district court? We don't do that on a preliminary injunction. Your Honor, I cannot cite a particular case right now. I can tell you I've been involved in a number of cases, though, where the courts of appeals have sustained rulings below on different grounds than the court below ruled upon because they had been raised below. We raised all this other exclusionary conduct below, so it's all in the record, so it's quite proper for you to do so. But, again, I understand that's something you'd have to decide. How are we going to resolve the disputed facts and where are we going to find the facts? The facts are all in the record. They're really all one-sided. If you look at the declaration of Dr. Rasher, which is in the record in the first preliminary injunction, he went through each of the exclusionary conduct, the restrictions on racetracks so they can't have competing events, the restrictions on our clients and other cars that we can't go in competing events even though we're independent contractors. This is not like a war. The district court never made any findings of fact on any of those issues. I mean, you may prevail on all of them. I don't know. But for today's purposes, we have nothing from the district court on any of those items. That is correct, Your Honor. The court did not make findings of fact on those specific items. But what I was going to say, the expert who testified against those, Dr. Hubbard, only thought about relevant market and those issues and did not go through and offer anything on pro-competitive justification. So if there was an equal record where they put in an expert who said, here's the pro-competitive justifications, and then you say, well, someone has to weigh that, I could see how it would be very difficult to go back now and do that. But it's a totally one-sided record. Our economists put in all the anti-competitive effects in the relevant market, and their economists said he disagrees with the relevant market, and he also put in something about racetracks as to why he thought there may be more racetracks available. That's the sum and substance of what the record was on that. If you're right, and you carry the day on some of these issues, and I suggest that those issues do sound like legitimate antitrust types of claims, because a monopolist has to be careful how to exercise his power so as not to restrain competition. It can do it with its own handiwork, its own good practices, but to leverage its power to restrain conduct which would be competition is a problem, would be a problem. If you proved all that and come before us, then the standard will be you'll have a wonderful position because the fact-finding will be clear error and all the other business and the legal theories. But we're presented with a very difficult situation where we have this very narrow preliminary injunction which inherently has some unappetizing aspects about it. In fact, that they mandate the signing of a contract, but yet they modify the contract. And I don't know if that's something that falls within the anti-competitive conduct or whether it even falls into any, I mean, you remember our decision in Omega, we sort of said you can't have your cake and eat it too, and that's what I'm wondering whether you're asking about. Maybe not. Let me at least address the Omega. I don't think Omega applies because at Omega they were seeking to invalidate a contract and said, no, we want the contract. Here the relief we're seeking is not to invalidate charter agreements. We say this specific clause and one other clause is in it. It goes beyond that. The Court mandated the signing of the charter agreement, and you have the benefit of it without the enforcement of mutual releases. But the Court also subjected us to all the other burdens of the contract, which we've been following. Other than the release, it was exactly the contract that had been offered to us. The release was the only one. He tried to make it very narrow. The other thing I just ask Your Honors to consider, the record shows that when we tried to get the transfer of the teams, that's another issue here. We purchased teams from the Stuart Haas. They were conditioning the purchase of those teams on agreeing to this release. We specifically asked them. We said we don't want to release our claims on the purchase. They had no justification for that. And they said, no, you can't get the teams. This is just an approval for money. And if Your Honor reverses this, they're going to take the position we should have to unwind those purchases, which is also going to be a harm to the ---- And if they're wrong on that, they expose themselves to trouble damages. Correct. And there may be a lot of damages, right? Correct. Correct, Your Honor. But that is another example whereby overturning this now, in the middle of the season in the purchases, is going to cause all this undisputed reputable harm to us, the third parties, the Stuart Haas who sold the Stuart Haas, by the way, no longer has any operation to run a team. So if we gave him the teams back, he has no drivers, he has no pit crew, he has nothing. In the middle of the NASCAR season, it will cause havoc to overturn this injunction in the middle of the season, while if it just stays into effect until November, we're done. And then we have a trial, and either we win or we lose. I have one question. Yeah. We have one. This doesn't go to the merits, but I was curious as to whether the parties had attempted mediation in this case. We ---- The court ordered mediation. We have a mediator assigned. We have not yet started the mediation process, but there will be a mediation process.  Thank you. Don't you think this would be a wonderful case for mediation? Both sides have major issues, and if the parties recognize a little bit of give and take, it looks to me like it's something that could be worked out. But ---- Your Honor, I'm in favor of a settlement. Anytime you can make a settlement for both sides, I'm in favor of it. Okay. Thank you. Thank you. All right. Mr. Gates? Thank you, Your Honor. Just a few points. It's clear after ---- At some point, I would like for you to address the argument by opposing counsel. If we decided to, that you were correct on the release argument, opposing counsel urges us to look at a list of other items. And so I'd like to know what you think about that.  I mean, let me start with the district court's order, which is very clear. The district court emphasizes that it does not reach and expresses no opinion as to plaintiff's likelihood of success on their other Sherman Act claims. So that's JA-177. With respect to my friend, Mr. Kessler, what he is challenging, for example, 6.6, the goodwill provision, is a standard provision and presumptively pro-competitive under the antitrust laws. Why? Your Honor, Judge Niemeyer was talking about leagues and letting people into sports leagues. What that provision says is if you want to race in NASCAR, you have to race exclusively in NASCAR to get all the benefits of the charter. If you don't want to be bound by 6.6, you can race as an open team. So we very much dispute, and there is ample evidence disputing what Mr. Kessler says in the record, and this court obviously should not be reaching out to affirm on issues that the district court did not reach. But what's clear from Mr. Kessler's argument is that the district court erred. He could not identify a single case in which any court in the United States in the 125 years of the Sherman Act has ever said that a release, a common thing, as Judge Niemeyer said in many, many, or in Judge Agee as well, in many commercial contracts, no court has said that a release constitutes anti-competitive conduct or antitrust injury. The reality here is that NASCAR and the teams are being hurt every day. Every day this injunction stays in place. NASCAR and other teams are being hurt. NASCAR is being hurt because it's forced into a contractual relationship with a counterparty that it doesn't want to be in a long-term contractual relationship with. Other teams are being hurt because, but for the injunction, other teams would have gotten more money. Other charter holders would have gotten more money. They would have gotten a bigger part of the pie, of the charter pie. Do you know in the races that have occurred so far this year under the contract, are the open spots filled in most of those races? Do you know? It depends on the race. Definitely the Daytona 500, which has occurred, the open spots are filled. In other races, sometimes they are, sometimes they are not. Now, I will say that I think that these plaintiff's cars would have qualified for every race, even as open teams. But the point is that other teams, other teams that sign charters and are in a long-term contractual relationship with NASCAR, would be getting more money, but for the district court's injunction. Two-thirds of the season is left. We would urge this court to act quickly because NASCAR and other teams are being hurt. What this case is, at the end of the day, it runs straight into Omega. I agree with Judge Niemeyer on that. They are trying to have their cake and eat it too. They found 10.3. 10.3 was their ability to try to get an injunction mandating a contract that they've rejected. Again, they rejected terms. They don't like the terms, and yet they asked this court, they asked the district court to order an injunction. We cited cases like the Host case from the Third Circuit and this court's Lauren Data case. I gather they would try to enforce 10.4 against you with respect to the claims. If they, potentially. I mean, they have not said they would not. We have counterclaims, and so we're now in a position where, potentially, they would argue in the district court, improperly in my view, that the release in 10.4 covers our counterclaims. This is another problem with mandating a contractual relationship. At the end of the day, that's what this is. The district court erred by imposing a contractual relationship, and, again, they rejected the contract in September. The litigation didn't start until October. But the Host case and the Lauren Data case from this court say there's no antitrust injury. If you don't like the terms of a commercial contract, you don't sign it. That's what happens. Those cases both say that just because you don't like the contract terms that are offered doesn't mean that there's a violation of the antitrust laws. We asked this court to reverse. If I can add one thing as unsolicited observation from where I sit, I would hope the parties would take mediation seriously. Certainly, but we're not going to rewrite the charter contract. I mean, the charter contract exists, and that's what they really want at the end of the day. They don't like the terms. They call all the terms, they call them all below competitive. We're not going to rewrite the charter contract, Your Honor, but certainly we're going to participate in mediation. But the clear thing here is the district court erred as even Mr. Kessler appeared to acknowledge it. Thank you. We'll come down and greet counsel and proceed on to the next case.
judges: Paul V. Niemeyer, G. Steven Agee, Stephanie D. Thacker